IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| TYRONE SIMS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 2:11CV562-SRW |
| ) | (WO) |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OF OPINION**

Plaintiff Tyrone Sims brings this action pursuant to 42 U.S.C. § 405(g) and §1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits and supplemental security income under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). (Doc. ## 8, 9). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

**BACKGROUND**

On June 18, 2008, plaintiff filed applications for disability insurance benefits and supplemental security income, alleging that he became disabled on July 1, 2007 due to "nerves and problems with memory/concentration." After the claim was denied at the initial administrative level, plaintiff requested a hearing before an administrative law judge; he

appeared before an ALJ at a hearing convened on December 10, 2009. (Exhibits 1A, 2A, 1B, 2B, 3B, 4B, 5B, 1D, 2D, 2E, 3E; R. 27-58). In a decision he issued thereafter, the ALJ concluded that plaintiff has "severe" impairments of "borderline intellectual functioning, learning disorder, and alcohol abuse, in current remission." (R. 17). He found that plaintiff's impairments, considered in combination, did not meet or medically equal the severity of any of the impairments in the "listings." (Id.). He further determined that plaintiff could no longer perform his past relevant work, but – using the Medical-Vocational Guidelines (the "grids") as a framework for decisionmaking – that plaintiff retained the residual functional capacity to perform jobs existing in significant numbers in the national economy. Thus, the ALJ concluded that the plaintiff was not disabled within the meaning of the Social Security Act from July 1, 2007, his alleged onset date, through the date of the ALJ's decision. (R. 22-23). The Appeals Council denied plaintiff's request for review (R. 1-5) and, accordingly, the decision of the ALJ became the final decision of the Commissioner. Plaintiff commenced this action thereafter. (Doc. # 1).

**STANDARD OF REVIEW**

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145

(11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

The plaintiff challenges the Commissioner's decision, arguing that: (1) the ALJ's RFC determination is not supported by substantial evidence because it conflicts with the mental RFC assessment and PRTF completed by the non-examining state agency consultant, and because the record includes no physical or mental capacity assessment from a treating or examining physician; and (2) the ALJ erred in reaching his step-five finding because, "[d]espite finding the claimant's illiteracy significant enough to preclude him from returning to his past work, the ALJ ignores this significant vocational factor in his application of the Grids to support a finding that [plaintiff] is not disabled." (Plaintiff's brief, Doc. # 14, pp. 5-9).

### The ALJ's Residual Functional Capacity Finding

The ALJ found that plaintiff "has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: He can

3

understand, remember, and carry out simple instructions. He can respond appropriately to supervision, co-workers, and others in usual work situations. He can deal with changes in a routine work setting." (R. 19). Plaintiff's first allegation of error is that "[t]hough the ALJ finds that [plaintiff] is capable of performing 'a full range of work at all exertional levels,' his finding is unsupported by any physical capacity assessment from either a treating or examining source." (Doc. # 14, pp. 5-6). However, plaintiff alleged no physical impairments or physical limitations in his applications for benefits. (See Exhibits 3E, 7E; R. 141, 163-70). He raised no issue of physical impairments or limitations at the administrative hearing before the ALJ; instead, he expressly denied – through counsel – that his claim included any allegations of physical impairments. (R. 29-58; see R. 31-32, attorney's opening statement (arguing that plaintiff is illiterate, suffers from severe mental problems, hears voices, talks to himself, gets nervous around strangers or crowds, and spends most of his day by himself; and stating, "Therefore, Your Honor, we believe because of his mental problems he is disabled under the Social Security Act."); R. 37 (attorney's negative response to the ALJ's question, "Are there any physical impairments that are alleged in this claim?); R. 37-43 (plaintiff's testimony relating mental problems only)). Plaintiff gave the ALJ no reason to believe that his physical exertional capacity might be limited in any way.[1] Therefore, the ALJ concluded that "[t]he claimant does not have any impairments that would limit his

---

[1] Upon its review of the evidence of record, the court adopts the Commissioner's summary of the medical evidence filed on May 13, 2013 (Doc. # 20). The record includes no evidence that plaintiff sought treatment for physical impairments or complained of physical limitations to any examining source. (Id; see also Doc. # 19 (plaintiff's summary of the evidence); Exhibits 1F, 4F, 5F (records from examining medical sources).

ability to perform exertional activities. Accordingly, the claimant can perform work at any exertional level." (R. 20). In his argument before the Appeals Council, plaintiff made no argument that his exertional capacity is limited to a greater extent than found by the ALJ or that he has medically determinable impairments that impose any physical limitations at all. (Exhibit 17E). Plaintiff's claim of disability, throughout the administrative proceedings, rested solely on his allegations of mental limitations.  Plaintiff's argument that the ALJ was required to procure a physical capacity assessment from a treating or examining source to support his conclusion that plaintiff suffered no exertional or other physical limitations is without merit.  See Street v. Barnhart, 133 Fed. Appx. 621, 630 (11th Cir. 2005)("[T]he failure of the ALJ to consider any of Street's presently alleged psychological, mental, or intellectual impairments is because Street and his counsel failed to cite anything other than a physical condition as the basis for Street's disability in his application and in his testimony at trial. Therefore, he should not be permitted to complain after the fact that the ALJ improperly failed to make an explicit factual finding regarding those alleged mental conditions.").

      Plaintiff further maintains that the ALJ's RFC finding as to plaintiff's mental capacity is not supported by substantial evidence because "the instant medical record of evidence is devoid of any residual functional assessment of [plaintiff's] functional mental capabilities made by ... an examining physician." (Doc. # 14, p. 7).  He notes that the consultative examiner diagnosed plaintiff with probable borderline intellectual functioning and a learning disorder, but "failed to indicate the functional result of these mental impairments."

5

(Id.)(citing R. 203). The court finds plaintiff's contention that the ALJ's RFC finding cannot have substantial evidentiary support in the absence of an examining medical source's functional capacities assessment that coincides with the finding to be without merit. Contrary to plaintiff's argument, the Commissioner's RFC assessment may be supported by substantial evidence, even in the absence of an opinion from an examining medical source about plaintiff's functional capacity. See Green v. Social Security Administration, 223 Fed. Appx. 915, 923 (11th Cir. 2007)(unpublished opinion)(ALJ's RFC assessment supported by substantial evidence where he rejected treating physician's opinion properly and formulated the plaintiff's RFC based on treatment records, without a physical capacities evaluation by any physician).[2]

Additionally, the record before the ALJ supports his finding. In reaching his conclusion that plaintiff was capable of understanding, remembering and carrying out simple instructions, the ALJ gave great weight to the opinion of the consultative psychologist, Dr.

---

[2] The Eleventh Circuit stated:

> Green argues that once the ALJ decided to discredit Dr. Bryant's evaluation, the record lacked substantial evidence to support a finding that she could perform light work. Dr. Bryant's evaluation, however, was the only evidence that Green produced, other than her own testimony, that refuted the conclusion that she could perform light work. Once the ALJ determined that no weight could be placed on Dr. Bryant's opinion of the Green's limitations, the only documentary evidence that remained was the office visit records from Dr. Bryant and Dr. Ross that indicated that she was managing her respiration problems well, that she had controlled her hypertension, and that her pain could be treated with over-the-counter medication. Thus, substantial evidence supports the ALJ's determination that Green could perform light work.

223 Fed. Appx. at 923.

Robert A. DeFrancisco. (See R. 22)("As for the opinion evidence, Dr. DeFrancisco opined that the claimant 'appears to be able to understand simple instructions and also carry them out. (Exhibit 1F-4). This opinion is consistent with the record as a whole and is given great weight."). The ALJ also gave "some" weight to the opinion of the non-examining state agency expert. (R. 22). As plaintiff notes, the mental RFC opinion of the non-examining psychologist, Dr. Hinton, was more restrictive than that assessed by the ALJ. (Doc. # 14, p. 6; see Exhibits 2F and 3F, Dr. Hinton's 10/27/08 assessments). Dr. Hinton concluded that plaintiff "can understand/ remember/ carry out instructions of a short-simple nature for at least 2 hr. periods without special supervision and within a traditional work environment." (R. 221). However, he added that plaintiff "should have minimal contact with the general public" and that "[c]hanges in the workplace should be infrequent[,]" limitations not included in the ALJ's RFC assessment. (Id.). The latter limitations conflict with the ALJ's conclusion that plaintiff "can respond appropriately to supervision, co-workers, and others in usual work situations" and "can deal with changes in a routine work setting." (R. 19). However, in reaching his RFC determination, the ALJ relied on evidence that was not available to Dr. Hinton when he rendered his opinion in October 2008 – i.e., the second examination conducted by Dr. DeFrancisco. (R. 20-21; Exhibit 5F).

On February 25, 2010, several weeks after the administrative hearing, plaintiff reported to Dr. DeFrancisco for a second consultative examination that included, in addition to a mental status examination, WAIS-III and WRAT-III testing. (Exhibit 5F, R. 230-34; see Exhibit 16E, ALJ's 3/17/10 proffer letter to plaintiff's counsel, forwarding the results of the

2/25/10 consultative examination). In his report, Dr. DeFrancisco stressed that plaintiff gave no effort during the examination and testing, and that his responses during the evaluation suggested blatant malingering. Dr. DeFrancisco noted that plaintiff "probably has borderline intelligence and learning disorder and questionable alcohol abuse," but that his "[r]estriction of activity and constriction of interest are hard to estimate due to his malingering today." Dr. DeFrancisco's sole diagnosis, after the second examination, was "Malingering[,]" and he indicated his suspicion that plaintiff's abilities were "a lot better than what he wants us to believe[.]" (Exhibit 5F).[3] The ALJ noted the inconsistencies between the responses plaintiff gave to Dr. DeFrancisco in the first consultative examination and those he gave in the second evaluation. (R. 20). The ALJ reasoned that "the findings from the consultative examinations were unreliable because plaintiff did not put forth his best effort," but concluded that plaintiff "credibly has some limitations from the impairments" – *i.e.*, the limitation he included in his RFC finding. (R. 21).

Plaintiff urges this court to remand this action "for further development of the record on which to base an appropriate RFC finding." (Doc. # 14, p. 7). However, the ALJ's post-

---

[3] Dr. DeFrancisco indicated that plaintiff had worked for "the city" for twenty years. (R. 233). In his work history report, plaintiff listed work for a construction company for two years and work for the City of Andalusia for two years as his only work in the fifteen years preceding his alleged onset date. (R. 152). While plaintiff's earnings record shows that he had sufficient earnings to have four quarters of coverage in each year from 1977 through 2003, except for 1988 and 1992 (no quarters of coverage) and 1994 (three quarters of coverage), he had earnings reported by the City of Andalusia only in 1997, 1998 and 1999. (Exhibit 3D). At the hearing, the ALJ questioned plaintiff about his work history. Plaintiff testified that he worked for the City in 1997 and 1998, for the construction company in 2001 and 2002, for a tire company for "about ten years, maybe longer than that" and in common labor jobs with a few different construction companies. (R. 35-37).

hearing effort to get a clearer picture of plaintiff's mental limitations was thwarted, according to Dr. DeFrancisco, by plaintiff's blatant malingering. The ALJ did not err by relying on the evidence before him, by giving Dr. DeFrancisco's assessments great weight, or by failing to adopt the additional limitations indicated by Dr. Hinton.[4] The court concludes, contrary to plaintiff's argument, that the ALJ's RFC assessment is supported by substantial evidence.

## The ALJ's Reliance on "the Grids"

Plaintiff contends that the ALJ "failed to apply the proper legal standard in his evaluation of the claimant's non-exertional limitations." He argues:

> The ALJ determined at step four of the sequential process that [plaintiff] was unable to perform any past relevant work due to 'insufficient evidence to

---

[4] The medical evidence of record includes the two consultative examinations by Dr. DeFrancisco (Exhibits 1F and 5F), the Psychiatric Review Technique Form and mental RFC forms completed by the non-examining psychologist, Dr. Hinton (Exhibits 2F and 3F) and treatment notes for plaintiff's three office visits with Dr. Millard McWhorter (Exhibit 4F)(treatment notes for 6/10/04, 6/30/09, and 7/13/09). The 2004 office visit preceded plaintiff's alleged onset of disability by three years. At that time, plaintiff – who was then drinking "almost daily" – complained of nausea, vomiting, forgetfulness, and "talking out of his head." Dr. McWhorter assessed chronic alcoholic, anorexia, and "Rule out Wernicke's psychosis." (R. 228). Plaintiff next returned to Dr. McWhorter on June 30, 2009, more than a year after he filed the present applications, complaining of lack of sleep and nervousness. Dr. McWhorter performed no physical examination (see R. 225, "DEFERRED"), assessed insomnia and anxiety, prescribed Ambien, and advised plaintiff to return in one month. (R. 225). Plaintiff returned To Dr. McWhorter on July 19, 2009, complaining of nervousness. Dr. McWhorter again deferred performing a physical examination and assessed insomnia and anxiety; he prescribed Ativan. (R. 224). Other than his diagnoses and prescriptions, Dr. McWhorter's treatment notes for the June and July 2009 office visits include no information other than plaintiff's complaints and vital signs. They do not indicate that Dr. McWhorter performed any mental status evaluation, and he assessed no mental limitations. (Exhibit 4F). Dr. DeFrancisco's mental status evaluations revealed no anxiety. (Exhibits 1F, 5F). At the administrative hearing, plaintiff and his counsel told the ALJ that he had been treated at South Central Mental Health. The ALJ held the record open a few days to receive those treatment records; counsel stated that they were expected to arrive at her office that day. (R. 30-31, 39-40, 57). The administrative transcript includes no treatment notes from South Central Mental Health, and no indication that plaintiff provided any such records to either the ALJ or the Appeals Council. (R. 4-5; 26).

9

> establish that the claimant's reading ability is adequate to perform past relevant work (Tr. 22). The ALJ then erroneously applies the Medical-Vocational Guidelines (hereinafter "Grids"), despite his prior determination that the claimant's non-exertional limitations were severe enough to prevent him from returning to past work (Tr. 22-23).

(Doc. # 14, p. 8). Plaintiff notes that "non-exertional impairments which significantly limit basic work activities render the Grids inapplicable." (Id.). He further argues:

> Despite finding the claimant's illiteracy significant enough to preclude him from returning to his past work, the ALJ ignores this significant vocational factor in his application of the Grids to support a finding that [plaintiff] is not disabled.

(Id., p. 9).

At step four, the ALJ concluded that, "[a]lthough an individual with the above stated residual functional capacity could perform the claimant's past relevant work as a trash collector, flagger, and construction laborer, *the evidence is insufficient to establish that claimant's reading ability is adequate to perform the past relevant work*[.]" (R. 22)(emphasis added). Thus, he found plaintiff unable to perform his past relevant work. As plaintiff notes, the vocational expert's hearing testimony regarding the literacy level required for plaintiff's past work was rendered partially inaudible by electrical interference with the video transmission. (Doc. # 14, pp. 3-4; R. 44-54). While it appears that the VE testified that none of the jobs discussed at the hearing would be precluded by illiteracy, part of that testimony was inaudible. (See R. 54).[5] Thereafter, the ALJ asked plaintiff's counsel, "[i]s there any

---

[5] The VE's testimony was as follows:

Q. [By plaintiff's counsel] My original question was which jobs would be excluded for someone who is illiterate and unable to engage in the basic mathematical

10

particular school or medical document where such a finding [of illiteracy] was made based on exam of testing?" (R. 54-55). Plaintiff's counsel responded, "Well, Your Honor, Mr. Sims' own testimony, as well as his school records where he received C's and D's, and it was also noted that he was in special education classes and he did not complete the seventh grade." (R. 55).[6] The ALJ questioned plaintiff briefly about his reading and arithmetic abilities. (R. 55-57). After the hearing, the ALJ sought more evidence of plaintiff's reading and arithmetic skills by sending him to Dr. DeFrancisco for WRAT-III testing. (Exhibit 5F). Plaintiff's test scores placed his reading and spelling ability at a "preschool" level and his arithmetic ability at a "kindergarten" level. (R. 233). However, Dr. DeFrancisco reported that the testing was "dysfunctional and not valid" due to plaintiff's malingering, and that "no weight should be given to these scores whatsoever." (R. 232-33). It appears to the court that the ALJ's conclusion that "the evidence is insufficient to establish that the claimant's reading ability is adequate to perform the past relevant work" results from the inaudible VE

---

    requirements?

    A. Essentially, illiterate – the definition of illiterate is the person would have below third grade academic levels. And based on the reasoning, math, and language I don't think any of the occupations which we [INAUDIBLE] would be excluded based on [INAUDIBLE].

(R. 54).

    [6] Plaintiff's school records show his grades (Cs and Ds) for first and second grade (he repeated the latter grade). There is a two year gap in the record thereafter, then the record shows plaintiff's first semester grades for sixth grade (all Fs except for a C in citizenship); however, the record reflects that plaintiff was absent 15 days of that term due to truancy, and that he was withdrawn from school on November 20, 1967, also due to "Truancy." The school record shows the result of IQ testing in December 1963 (IQ of 87); it includes no indication that plaintiff attended special education classes. (Exhibit 8E, R. 172-74).

testimony, the lack of a clear record of the literacy level required in plaintiff's past work as he actually performed it, and the ALJ's inability to obtain a valid assessment of plaintiff's reading skills. These evidentiary problems inured to plaintiff's benefit at step four of the sequential analysis, as the ALJ found him to be unable to perform his past relevant work. (R. 22).

Once the plaintiff establishes that he cannot perform his past relevant work, the burden shifts to the Commissioner to prove that the plaintiff can still perform other work existing in significant numbers in the national economy. Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996). The Commissioner may meet this burden, in some cases, by relying exclusively on the grids. In other cases, the ALJ must have testimony from a vocational expert to support a step five determination that other work within plaintiff's capabilities exists in significant numbers in the national economy. "The general rule is that after determining the claimant's RFC and ability or inability to return to past relevant work, the ALJ may use the grids to determine whether other jobs exist in the national economy that a claimant is able to perform. However, '[e]xclusive reliance on the grids is not appropriate *either* when [the] claimant is unable to perform a full range of work at a given residual functional level *or* when a claimant has non-exertional impairments that significantly limit basic work skills.'" Phillips v. Barnhart, 357 F.3d 1232, 1242 (11th Cir. 2004)(citations omitted). Id. at 1242 (emphasis in original)(citations omitted).

As discussed above, plaintiff alleged no physical limitations and the ALJ's conclusion that he "has the residual functional capacity to perform a full range of work at all exertional

levels" (R. 19) is supported by substantial evidence. Thus, before relying on the grids, the ALJ was required to determine whether plaintiff's nonexertional limitations significantly limit his basic work skills – *i.e.*, whether they prohibit him "from performing 'a *wide* range' of work at a given work level." Id. at 1243 (citation omitted)(emphasis in original). In this case, the ALJ found that plaintiff's impairments resulted in "the following nonexertional limitations: He can understand, remember, and carry out simple instructions. He can respond appropriately to supervision, co-workers, and others in usual work situation. He can deal with changes in a routine work setting." (R. 19). The ALJ concluded that plaintiff's nonexertional limitations "have little or no effect on the occupational base of unskilled work at all exertional levels." (R. 23). As the ALJ concluded, plaintiff's RFC does not preclude the performance of the basic mental activities required to perform unskilled work. See SSR 85-15 ("The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. ... Where there is no exertional impairment, unskilled jobs at all levels of exertion constitute the potential occupational base for persons who can meet the mental demands of unskilled work.").

     The ALJ also found plaintiff to be illiterate. (R. 22, Finding No. 8). Plaintiff contends that this finding precludes the ALJ's use of the grids at step five because it is a "non-exertional limitation [that is] severe enough to prevent him from returning to past work[.]" (Doc. # 14, p. 8). A finding in favor of a claimant with only nonexertional limitations at step

four does not necessarily preclude an ALJ's reliance on the grids at step five.  See Collins v. Commissioner of Social Security, 357 Fed. Appx. 663, 671 n. 3 (6th Cir. 2009)(rejecting the claimant's argument that "the ALJ's own findings that: 1) he had no physical limitations; and 2) he could not perform past relevant work, necessitate a finding that his nonexertional limitations have more than 'little to no effect' on the occupational base of unskilled work and thus reliance on the Grids is inappropriate.").  Additionally, contrary to plaintiff's contention, illiteracy is not a nonexertional limitation.  Wolfe, 86 F.3d at 1078 ("[I]lliteracy is not a nonexertional impairment. Examples of nonexertional mental impairments include 'difficulty maintain attention or concentrating,' and 'difficulty understanding or remembering detailed instructions. ...There is nothing in the regulations or case law to indicate that illiteracy, in and of itself, should be considered a nonexertional impairment.")(citations omitted). The Medical-Vocational Guidelines make clear that a claimant's illiteracy does not, standing alone, render them inapplicable.  Instead, illiteracy is taken into account as a vocational factor, within the category of "Education."  Cf. 20 C.F.R. Pt. 220, App., ¶ 201.00(i),¶ 202.00(g), Tables 1 and 2 (vocational impact of illiteracy on claimants limited to sedentary or light work); see also VE's testimony at R. 54 ("[T]he definition of illiterate is the person would have below third grade academic levels.").  The ALJ observed, correctly, that when a claimant "has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking[.]" (R. 23)(citing SSR 85-15).  That section provides, in part, that "an impairment which does not preclude heavy work (or very heavy work) would not ordinarily be the primary reason for unemployment, and

14

generally is sufficient for a finding of not disabled, even though age, education, and skill level of prior work experience may be considered adverse." 20 C.F.R. Pt. 220, App. 2, § 204.00.  Because plaintiff has no exertional limitations and he remains able to perform the basic mental demands of unskilled work, his illiteracy did not preclude the ALJ's reliance on § 204.00 of the Medical-Vocational Guidelines to support his step five finding.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is due to be affirmed.  A separate judgment will be entered.

DONE, this 29th day of July, 2013.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE